[Civ. No. 8133.  Third Dist.  Sept. 26, 1952.]

LUTHER D. BASSETT, Respondent, v. CHARLES B. CRISP, Appellant.

Vernon F. Gant and Oliver D. Germino for Appellant.

C. Ray Robinson, R. A. McCormick and William B. Boone for Respondent.

THE COURT.—Plaintiff, a guest in an automobile driven by defendant Charles B. Crisp, claimed injury resulting from the alleged misconduct of defendant. Upon trial the jury rendered a verdict in favor of plaintiff and against defendant in the sum of $45,000, and defendant has appealed from the judgment entered upon said verdict. Defendant has also appealed from the order denying his motion for judgment notwithstanding the verdict.

The first and principal contention of appellant is that the evidence is wholly insufficient to sustain a finding of wilful misconduct. ■ Before proceeding to discuss this contention we shall quote the well settled rule so aptly expressed in *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, at page 503 [106 P.2d 886], as follows:

"As is always true on such appeals, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if possible. It is elementary that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury or trial court. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Treadwell* v. *Nickel*, 194 Cal. 243 [228 P. 25]; *Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 P. 1157]; *Wing* v. *Kishi*, 92 Cal.App. 495 [268 P. 483].)"

Bearing this familiar rule in mind we shall summarize briefly the factual situation as disclosed by the record.

■ The accident occurred on January 12, 1950, at about 6:00 or 6:30 p. m., at the intersection of East Charter Way and South San Joaquin Streets in Stockton. It involved the 1941 Cadillac sedan owned and operated by defendant-appellant, Charles B. Crisp, and a 1941 Ford coupé operated by

Mrs. Gladys Curry. Respondent Bassett was an admitted guest in appellant's car, riding on the right side of the rear seat. Other guests in appellant's vehicle were Dr. Jeremiah J. Wolohan in the middle of the front seat, Bobby J. Vander Griff on the right side of the front seat, and one Arthur Pierce on the left side of the rear seat. The intersection is controlled by the standard three color electric signal, one such traffic light being posted at each of the four corners of the intersection. Appellant concedes that he drove into the intersection through the red light. Mrs. Curry, who was driving in a northerly direction on South San Joaquin Street, testified that as she was about one-half block away from the intersection, the lights facing her turned green and were still green when she drove into the intersection; her Ford struck the right side of appellant's Cadillac, which was proceeding in an easterly direction on East Charter Way.

Earlier that day the group went to Stockton to ride in a boat owned by Dr. Wolohan, and kept by him in the Stockton harbor. Dr. Wolohan drove his own car to respondent's residence in Winton and the two proceeded in the Wolohan car to defendant's home in Delhi. Then all three went in defendant's Cadillac to Livingston where they picked up Mr. Pierce, and then they went to Modesto where Mr. Vander Griff joined them. Appellant Crisp then drove the group to Stockton in his vehicle, arriving at about 2 or 3 p. m. After several hours in the boat, the group started home some time between 5 and 6 p. m. in Crisp's automobile, with Crisp driving. They were seated as previously described, with plaintiff on the side which was struck.

Respondent testified that at one red light he said to appellant as he was driving through the intersection, "Charlie, you got a red one there." There was testimony that at another red light, Dr. Wolohan warned appellant, "we don't want any more red lights." Mr. Pierce testified, by deposition, that he remembered that someone in the car had warned appellant about going through a red light just prior to the accident. Mrs. Curry testified that after the accident she rode to the hospital in an ambulance with Dr. Wolohan and appellant, and that during the trip the doctor said to appellant, "I saw that light was red and I warned you," and that appellant responded, "I didn't see it in time." Respondent also testified that just before the collision he saw the traffic signal and said, "My God, another red light." There is also testimony by Dr. Wolohan and appellant, esti-

mating that at the time of the collision appellant was traveling about 30 miles per hour; respondent's testimony was that "we was traveling pretty fast." Plaintiff testified that the force of the collision knocked him all over the car, and that when he stopped bouncing he was on one knee with his toe in the seat and his arm on the back of the front seat.

Appellant in his briefs quotes testimony which may be deemed to contradict some of the material parts of the foregoing summary of the evidence, but we are not here concerned with the matter of weighing conflicts in testimony. Taking all of the evidence into consideration, together with every inference and presumption favorable to respondent which may reasonably be deduced therefrom, and disregarding all evidence in conflict therewith, the evidence is fairly susceptible of the construction that on a city street, on a night that was dark, and when the traffic was heavy, the appellant drove through at least four red traffic lights within the last 10 or 12 blocks immediately preceding the collision, that he was warned about it several times, that his rate of speed was about 30 miles per hour and that he drove into the intersection at which the collision occurred against the red light without looking for traffic approaching the intersection with the green light.

In the case of *Allen* v. *Robinson,* 85 Cal.App.2d 617 [198 P.2d 498], this court held that in an action for injuries received by plaintiffs in an automobile collision while riding as guests of defendant, the evidence supported a verdict attributing plaintiffs' injuries to defendant's wilful misconduct, where it appeared that defendant drove across town at a high rate of speed, ignored repeated admonitions to slow down, and entered an intersection at about 35 miles per hour in disregard of a plainly visible stop sign. We there said, at pages 620-622:

"A definition of 'wilful misconduct,' followed and approved in many later cases, is contained in *Turner* v. *Standard Oil Co.,* 134 Cal.App. 622, 626 [25 P.2d 988], as follows:

" 'Wilful misconduct, within the meaning of this statute, may then be defined as intentionally doing something in the operation of a motor vehicle which should not be done or intentionally failing to do something that should be done under circumstances disclosing knowledge, express or to be implied, that an injury to a guest will be a probable result.'

"This court adopted the same definition in *Hagglund* v. *Nelson,* 23 Cal.App.2d 348, 352 [73 P.2d 265], and a hearing

in the Supreme Court was denied. ██ In that case *Norton* v. *Puter*, 138 Cal.App. 253, 258 [32 P.2d 172], in which the Supreme Court denied a hearing, was quoted as follows:

" 'Wilful misconduct depends upon the facts of a particular case and necessarily involves deliberate, intentional or *wanton conduct* in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, that danger is likely to result therefrom.' (Italics added.)

"In *Bechtold* v. *Bishop & Co., Inc.*, 16 Cal.2d 285 [105 P.2d 984], failure to stop at a stop sign was held to constitute wilful misconduct. Also, a disregard of stop signs and speed were deemed to constitute 'wilful misconduct' in *Gibson* v. *Easley*, 138 Cal.App. 303 [32 P.2d 983], where, as here, the driver was earnestly admonished by his guest to drive more slowly. Speed and disregard of stop signs were also held 'wilful misconduct' in *Browne* v. *Fernandez*, 140 Cal.App 689 [36 P.2d 122], in which Justice Spence in his concurring opinion (hearing in Supreme Court denied by a divided court) said at page 697:

" 'Disregarding conflicts, there was evidence in this case to show that despite the admonition of his guests, appellant Mabie disregarded the stop sign, proceeded into the intersection at a speed of approximately twenty-five miles per hour and then speeded up his car in an effort to beat the two oncoming cars which were traveling along the highway. Conceding the case to be a close one, I believe that the jury could properly infer from the evidence presented that there was the requisite intent and that there was the requisite knowledge of probability of injury to his guests to constitute wilful misconduct.'

"Speed under the circumstances of time and conditions of the highway was also held to constitute 'wilful misconduct' in *Van Fleet* v. *Heyler*, 51 Cal.App.2d 719 [125 P.2d 586]; and in *DeLoss* v. *Lewis*, 78 Cal.App.2d 223, 225 [177 P.2d 589], the court said:

██ " ' "Therefore," as said in *Hastings* v. *Serleto*, 61 Cal. App.2d 672, 682 [143 P.2d 956], "the question of whether the defendant driver herein intentionally drove his automobile with a wanton and reckless disregard of the possible result of such driving or whether he intentionally drove his automobile with a knowledge, express or implied, that serious injury would be a probable (as distinguished from a pos-

sible) result thereof, is essentially one of fact for determination by the fact finder.'' '

''In *Rawlins* v. *Lory,* 44 Cal.App.2d 20, 23 [111 P.2d 973], the course of conduct of the driver of the car involved in an accident was held properly considered in arriving at a determination as to whether he was chargeable with wilful misconduct, such conduct being designated as 'skylarking.' ''

See, also, *Hollingum* v. *Moore,* 102 Cal.App.2d 509 [227 P.2d 845], where it was held that in an action for injuries sustained by a guest in defendant's automobile, the court could reasonably draw the inference that defendant was guilty of wilful misconduct from evidence that he ignored a stop sign in driving onto a heavily traveled highway, and, against the repeated protests of plaintiff, drove at such a high rate of speed in a direction opposite from the agreed destination that, being unable properly to maneuver through traffic, he swung to the right off the traveled portion of the highway and struck a concrete pole in broad daylight with such force that plaintiff was thrown through the windshield.

Applying these well-settled principles of law to the facts of the instant case we are satisfied that the record amply supports the implied finding of the jury that the appellant was guilty of wilful misconduct.

Appellant next contends that the evidence wholly fails to establish that the plaintiff received any injury while riding in the defendant's automobile other than the slight laceration of the face and, on the contrary, shows definitely that there is no known or established connection between the plaintiff's condition as it later developed and existed at the time of the trial and any injury received by him while riding in defendant's vehicle.

Appellant's argument upon this point is in effect an argument as to the weight of conflicting evidence, and is one which could be, and doubtless was, urged in the trial court, but having failed to convince the trial court it is of little weight in an appellate tribunal.

The record shows that prior to the accident respondent was in normal good health. Subsequent thereto, his legs began to weaken and over a period of several months gradually became paralyzed, his arms weakened to the point where they were almost useless, and for a while he could not move anything except his head. Plaintiff was under fairly constant medical care, and was hospitalized at various times. During the several months prior to trial, respondent noticed some

improvement in the upper part of his legs, but he could not stand without leg braces unless he used his crutches for balance. These effects resulted from damage to respondent's spine. Several weeks after the accident, while respondent still had power of locomotion, he either fell or suffered a sprain while working on Dr. Wolohan's boat. Appellant urges that respondent's condition stems entirely from this incident rather than from any trauma sustained in the automobile accident. However, there is evidence in the record that respondent started complaining of a stinging and burning sensation in his legs within a day or two after the accident, and that he started having medical care about a week after the accident. There is competent medical testimony in the record connecting respondent's condition with the injury sustained in the accident of January 12, 1950, and respondent's disability has also been diagnosed as permanent.

Appellant next contends that the court committed prejudicial error in permitting respondent's counsel to cross-examine Dr. Wolohan, called as a witness by respondent, by directing his attention to certain questions and answers given in a deposition taken several months before the trial. Appellant argues that it is not permissible for a party to interrogate his own witness concerning previous inconsistent statements where a witness merely fails to testify to a material fact as expected, and that it is necessary in order to authorize such examination that the witness shall have given testimony hurtful to the party calling him, citing *Estate of Dolbeer*, 153 Cal. 652 [96 P. 266, 15 Ann.Cas. 207] ; *Worley* v. *Spreckels Bros. Com. Co.*, 163 Cal. 60 [124 P. 697] ; *People* v. *Kawasaki*, 23 Cal.App. 92 [137 P. 287] ; *Agalianos* v. *American Central Ins. Co.*, 62 Cal.App. 349 [217 P. 107] ; *People* v. *Deckert*, 77 Cal.App. 146 [246 P. 157] ; and *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618].

The following appears in the record:

"Q. [By Mr. McCormick] Now Doctor, at any time prior to reaching the intersection of South San Joaquin and East Charter Way, did you observe Mr. Crisp go through any red lights? A. I did not observe it myself, no, sir.

"Q. Do you recall anything being said to Mr. Crisp at any time prior to reaching the intersection at which the accident occurred by anyone in the car with reference to going through a red light? A. The intersection before, somebody in the rear seat said something, going through the light, going through the intersection, rather.

"Q. Said something to the effect that, you had gone through a red light? A. Something of the sort.

"Q. Yes. Insofar as the intersection where the accident occurred, you observed the red light, did you, as you entered the intersection? A. Yes.

"Q. And was it red? A. It was.

"Q. Well, as a matter of fact, Doctor, you knew that he had gone through the red light prior to reaching the intersection at which the accident happened, hadn't you?

"Mr. Gant: We object to his cross-examination of his own witness.

"The Court: Sustained.

"Mr. McCormick: I claim surprise and request permission to cross-examine the witness.

"The Court: Well, at this stage of the examination I deny your request.

. . . . . . . . . . .

"Mr. McCormick: I asked you, Doctor—let me see if I can put it this way. Prior to entering the intersection, you stated that about 50 feet back you saw a red light, is that right?

"A. No, sir, I don't believe so, sir. I believe that I said that when we entered the intersection I saw the other car coming and I think about that time I saw the red light.

"Mr. McCormick: Well your Honor, I want to claim surprise and I want to ask leave of the Court to question this man about page nine, line 23 of his deposition, to where his testimony is entirely contrary to what it is now.

"Mr. McCormick: Q. And you are a good friend of Mr. Crisp's, are you not, Doctor? A. I am, sir.

"Mr. Gant: Now just a minute, if your Honor please——

"The Court: I will not allow that request at this time.

. . . . . . . . . . .

"Mr. McCormick: Q. Directing your attention to the intersection of East Charter Way and South San Joaquin, did you at any time prior to reaching that intersection, observe the light was red?

"A. It is hard for me to remember that far back, but I don't believe that I did.

"Q. Do you recall at any time prior to reaching that intersection saying anything to Mr. Crisp about the red light? A. No, sir.

"Mr. McCormick: Well, I would like to take the matter up——

"THE COURT: That is the basis of your request now?

"MR. McCORMICK: Yes."

After the matter was discussed by counsel and court outside of the presence of the jury, the court permitted counsel for respondent to use the deposition in asking leading questions of Dr. Wolohan.

It is well settled that a party may impeach his own witness by the use of prior inconsistent statements where he has been surprised and damaged by the witness' testimony. (See Code Civ. Proc., §§ 2049, 2052; *Rystinki* v. *Central California T. Co.*, 175 Cal. 336, 342 [165 P. 952].) There can be no doubt as to respondent's surprise at the testimony of the witness, and the question to be determined is whether Dr. Wolohan's testimony prejudiced respondent's case and warranted his impeachment.

Appellant relies heavily on *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618]. In that case defendant was charged with murder and a witness for the prosecution was asked on direct examination if at the time of the crime she had seen anyone in a building where the killing occurred. She replied, "No, I didn't." Over objection the district attorney was permitted to impeach the witness by showing her prior extrajudicial statements that she had seen defendant in the building at that time. The admission of her prior inconsistent statements was held to be error on the ground that her testimony "was purely of a negative character . . . neither favorable to one side or the other" and was in no way damaging to the prosecution's case.

However, in the very recent case of *People* v. *LeBeau*, 39 Cal.2d 146 [245 P.2d 302], the Supreme Court, speaking through Chief Justice Gibson, said at page 149:

"The Newson case did not, of course, purport to lay down a rule that all negative answers are harmless, and it is necessary to determine on the facts of each case whether the testimony of the witness sought to be impeached has actually damaged the party calling him. Here we are satisfied that the witness' answer was more than a harmless refusal to testify as expected and that it prejudiced the People's case. Mrs. McDowell was placed on the stand by the prosecution for the purpose of impeaching defendant's credibility and rebutting his testimony that he did not use narcotics. Her denial that defendant had ever told her that he used cocaine was likely to make it appear to the jury that the district

attorney was harassing defendant and attempting to discredit him without any basis in fact by asking him on cross-examination if he had not told Mrs. McDowell that he used the drug. This impression might well have been aggravated in the jurors' minds by the fact that the subject of defendant's use of narcotics was brought into the case by defendant himself. Under the circumstances the prosecution was entitled to correct this damaging impression by cross-examining its own witness and by impeaching her with proof of her prior inconsistent statements.''

Appellant urges that the witness here had merely failed to testify to a material fact as expected and so respondent had no basis for impeaching his own witness. However, the testimony must be held adverse and hostile, because it tended to show that appellant did not drive through a series of red lights, that the lights, if red, were not plainly visible, that the lights were not seen by the guests in defendant's car, and that defendant had not been warned about the red light at the scene of the accident. The situation thus falls within the rule that a party may impeach his own witness by the use of prior inconsistent statements where he has been surprised and damaged by the witness' testimony. (*People* v. *LeBeau*, *supra*.)

Furthermore, the record shows that the witness was thoroughly cross-examined on the same points and upon all of the incidents leading up to and surrounding the accident, and that all of the other occupants of appellant's automobile were called and testified, and we are convinced after an examination of the entire record that, even if the admission of such evidence was erroneous, it did not result in a miscarriage of justice. (Const., art. VI, § 4½.)

Appellant lists four instructions requested by respondent and given by the court. and contends that they are erroneous. No authority is cited to support appellant's contention. Instructions to a jury must be considered as a whole, and we have read all of the instructions given, and are satisfied that the jury was fully, fairly and correctly instructed as to all phases of the law applicable to the case. Appellant offered numerous instructions and all but three were given by the court. On the subject of wilful misconduct alone eight separate instructions were offered by appellant and given by the court. The first two instructions questioned read as follows:

"If you find from the evidence that the defendant Charles Crisp intentionally did something or failed to do something in the operation of his automobile, and you further find from the evidence that such intentional act or omission, if any, is sufficient to disclose implied knowledge of probability of injury to either the plaintiff, Luther Bassett, or other guests in the car, the defendant, Charles Crisp, is charged with knowledge of the probable consequences of his conduct, such consequences being apparent to any person of ordinary prudence of which you ladies and gentlemen of the jury are exclusive judges."

"If you find from the evidence that the defendant Charles Crisp intentionally disobeyed a traffic signal and went against a red light, then you must determine whether or not he should have known under the circumstances, as a reasonably prudent man, that injury to the plaintiff, Luther Bassett, or other guests in his automobile, would probably result. If he should have so known, then he would be guilty of wilful misconduct."

These two instructions were given immediately following an instruction offered by appellant reading:

"If you find that the defendant Crisp did, on one or more occasions enter an intersection against a red light but that his act in so doing was accidental or inadvertent or due to oversight or lack of care then I instruct you that the defendant is not liable to the plaintiff for any injury suffered by plaintiff as a result thereof. Before you can find for the plaintiff you must find from a preponderance of the evidence that the defendant was guilty of wilful misconduct as those words are defined for you in these instructions. If it is claimed that the defendant's wilful misconduct consisted of entering an intersection or intersections against a red light before he can recover damages from the defendant, plaintiff must prove by a preponderance of the evidence that the act of the defendant in so doing was wilful, deliberate and intentional and was done under such circumstances as to indicate knowledge on the part of defendant that injury to the plaintiff would probably result or with a wanton and reckless disregard for the probable consequences."

There was no error in giving any of the instructions questioned by appellant.

Appellant's final contention is that respondent made no objection to the manner in which the automobile was operated by appellant, and having made no requests to

be permitted to leave the vehicle was guilty of contributory negligence for assumption of the risk incident to riding in the vehicle under the circumstances existing.

What we said in *Allen* v. *Robinson, supra,* at page 622, is quite applicable here:

"As for appellants' contention that plaintiffs assumed the risk of injury by riding with appellant, this, again, was a question for the jury; and appellants so recognized it in one of their requested instructions which was given by the trial court. See *Lindemann* v. *San Joaquin Cotton Oil Co.,* 5 Cal.2d 480, 507 [55 P.2d 870]; *Shields* v. *King,* 207 Cal. 275 [277 P. 1043]; *Van Fleet* v. *Heyler* [51 Cal.App.2d 719 (125 P.2d 586)], *supra,* at pages 733-734.

"Regarding the third argument, that plaintiffs were guilty of contributory negligence because they did not warn the driver of the existence of the stop sign, that, also, presented a question for the jury. (*Shields* v. *King, supra; Cate* v. *Fresno Traction Co.,* 213 Cal. 190, 201 [2 P.2d 364]; *Meyers* v. *Southern Pac. Co.* 63 Cal.App. 164, 168 [218 P. 284]; *Tice* v. *Pacific Electric Ry. Co.,* 36 Cal.App.2d 66, 71 [96 P.2d 1022, 97 P.2d 844].)" ▮ And as stated in *Van Fleet* v. *Heyler,* 51 Cal. App.2d 719, at page 733 [125 P.2d 586]:

". . . The true rule on this point is not that a guest must, where he knows the driver's conduct is improper, leave the car merely if he has reasonable opportunity to do so, but that he must leave it, a reasonable opportunity being afforded, if a person in the exercise of ordinary care would do so under the circumstances."

Appellant's recognition of the factual nature of this issue is apparent from his request for instructions on assumption of risk and contributory negligence, both of which the court gave. One of them concludes:

"Thus, it will be seen that failure of a guest to protest if there was such failure is merely one fact to be considered with all the other circumstances in determining whether a guest assented to his host's wrongdoing and voluntarily assumed the risk."

We conclude that the implied findings of the jury against appellant upon the issues of assumption of risk and contributory negligence are fully supported by the record.

The judgment and orders are affirmed.